# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 17-722V
(not to be published)

```
* * * * * * * * * * * * * * * * * * * * * * *
                                              *
K.N.,                                         *
                                              *
            Petitioner,                       *    Filed: January 3, 2023
                                              *
v.                                            *
                                              *
SECRETARY OF HEALTH                           *
AND HUMAN SERVICES,                           *
                                              *
            Respondent.                       *
                                              *
* * * * * * * * * * * * * * * * * * * * * * *
```

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, Petitioner

*Naseem Kourosh*, U.S. Dep't of Justice, Washington, DC, Respondent.

### **DECISION AWARDING DAMAGES**[1]

On May 31, 2017, Linda Chen filed a claim filed on behalf of her then-minor child, K.N., for compensation pursuant to the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] K.N. became the named petitioner after she turned 18 years old. ECF No. 114. The Petition alleged that K.N. suffered from a neurological demyelinating disorder as a result of her receipt of a Tetanus-diphtheria-acellular pertussis ("Tdap") vaccine on June 7, 2014. Petition (ECF No. 1) at 1.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

I ruled in Petitioner's favor on July 2, 2021. *See* Ruling, dated July 2, 2021 (ECF No. 88) ("Ruling on Entitlement"). My ruling noted that Petitioner's most-likely injury, based on the record, was Myelin Oligodendrocyte Glycoprotein ("MOG") Antibody Disease ("MOGAD"), a neuroinflammatory condition. The parties could not come to an agreement on the proper quantum of damages, and I therefore ordered them to brief their respective positions. *See* Petitioner's Brief, dated May 31, 2022. ECF No. 107 ("Br."); Respondent's Brief, dated July 29, 2022. ECF No. 110 ("Opp."); Petitioner's Reply, dated August 15, 2022. ECF No. 113 ("Reply").

After review of the briefs and record, and for the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$194,139.19**, **representing $190,000.00 for actual pain and suffering, $2,190.00 for future unreimbursed expenses, and $1,949.19 for past unreimbursed expenses.**

I.      **Factual Background**[3]

K.N. was born on ▇▇▇▇ 2004. Ex. 1 at 1. Prior to vaccination, she was a healthy ten-year-old girl. *See generally* Ex. 2. On June 7, 2014, K.N. received the Tdap vaccine. Ex. 1 at 2; Ex. 2 at 9. Afterwards, K.N. traveled to France for a family vacation, during which time her mother reported she experienced no medical issues. Ex. 3 at 24–26. Within a couple of weeks of receiving the vaccine, however, Petitioner started complaining of headaches, and then at the beginning of July began having problems with her vision. Ex. 10 at 2. On July 4, 2014, K.N. woke up crying, telling her mother that she could not see anything. *Id.* K.N.'s mother therefore rushed her daughter to the emergency room at the California Pacific Medical Center in San Francisco, California. *Id.*

Emergency care treaters recorded K.N. as experiencing bilateral vision loss which had started approximately two to three days earlier. Ex. 3 at 4, 24, 175. It was also noted that K.N. a had a "recent sick contact" with her cousin, who had a fever, but K.N. had not felt ill herself. *Id.* at 24. The results of a brain MRI showed "[s]uspected bilateral optic neuritis." *Id.* at 168. She received treatment with high-dose steroids, and on July 5, 2014, was transferred out of the intensive care unit. *Id.* at 175. Her pediatric neurologist proposed K.N. had acute disseminated encephalomyelitis ("ADEM"). *Id.* at 146.

K.N. remained hospitalized until July 7, 2014, and during that time her vision improved following treatment with steroids. Ex. 3 at 5. Upon discharge, K.N.'s diagnosis was parainfectious optic neuritis ("ON"), and her prognosis was deemed excellent. *Id.* On July 8, 2014, K.N. underwent a neuro-ophthalmology evaluation with Richard Imes, M.D. Ex. 2 at 50. K.N.'s mother reported that her daughter "may have [had] a mild fever with a headache a couple of weeks prior to losing [her] vision." *Id.* K.N.'s optic disc swelling

---

[3] In the interest of efficiency, I am summarizing herein relevant portions of the Ruling on Entitlement. ECF No. 88 at 2–5.

had improved, and Dr. Imes recommended tapering her steroid treatment over the next ten days. *Id.* He concluded that K.N. most likely had experienced ON "despite the vague history of an antecedent viral illness… Post-immunization bilateral optic neuritis is well reported but not after DTaP vaccine." *Id.*

On July 23, 2014, K.N. had a follow-up appointment for her ON. Ex. 4 at 1083. Her vision was 20/150 in her right eye and 20/200 in her left eye. *Id.* at 1084. The impression was that K.N. had isolated papillitis bilaterally, and her treater noted it was "[v]ery unlikely to be [multiple sclerosis] or other systemic pathology and ot [sic] related to recent vaccination as no other cortical leukoencephalopathy [was] seen. This condition is thought to be post-viral." *Id.* at 1086. On July 29, 2014, K.N. visited ophthalmology for another follow-up and the record noted that the "[p]atient feels like visual acuity improved…Medications: stopped steroids 2 days ago… Assessment/plan: optic neuritis: Improving, now feels like visual acuity almost back to baseline." Ex. 8 at 1.

On August 26, 2014, K.N.'s pediatrician examined her for a recent headache with a fever (which improved with ibuprofen) and vomiting. Ex. 2 at 8. K.N. also reported decreased energy, but she denied eye pain or blurriness. *Id.* Two days later, on August 28, 2014, K.N. presented to the emergency room at the University of California – San Francisco due to acute onset left-sided "body shaking, numbness, and weakness." Ex. 4 at 56. By this time, K.N.'s ON had "nearly completely resolved." *Id.* at 56–57. She was admitted to the pediatric intensive care unit and underwent a lumbar puncture; the results were "concerning for infection [versus] inflammatory process." *Id.* at 57. An MRI angiography did not show signs of a stroke, mass, or a demyelinating process, but revealed an "abnormal vascular flow in [the right] hemisphere including the occipital lobe possibly concerning for a vasculitis." *Id.* The attending neurologist added:

> Acute onset weakness in tri-phasic illness with multiple lesions not severe appearing in MRI. This is mostly consistent with an auto-immune reaction… She had NMO [neuromyelitis optica] negative titers, but will need to follow up on this, as this seems most likely. She is of Japanese descent, which also increases the risk for NMO. For follow up and prognostic purposes, would also consider [lumbar puncture] to get repeat titers and to get spinal MRI. Treat with pulse steroids with taper. If she does not respond to this, would consider IVIg or PLEX.

*Id.* at 299.

K.N. thereafter had an infectious disease consultation on August 29, 2014 with Dr. Nicole Learned, who noted that lab findings were not consistent with any particular infectious etiology, and that instead a vasculitic or immune-modulated process was the more likely causal.

3

Ex. 4 at 297. After improvement with steroid treatment, K.N. was discharged on September 5, 2014. *Id.* at 67. The discharge summary stated that a "very broad laboratory work-up has returned all negative data," and K.N.'s neurological function had improved such that she was "nearly back to baseline." Ex. 2 at 120; Ex. 4 at 67. Her diagnosis was left-sided weakness, and she remained on many medications, including prednisone. Ex. 2 at 61, 77. K.N. also developed a urinary tract infection, and antibiotics were prescribed. *Id.* at 77–78.

On September 11, 2014, K.N. saw Dr. Creig Hoyt, a neuro-ophthalmologist, who noted that her "optic neuritis with edema of optic disc" had "completely resolved." Ex. 4 at 1089. Approximately one month later, on October 9, 2014, K.N. began outpatient physical therapy for muscle weakness secondary to encephalitis. Ex. 3 at 213. The notes state that "[diagnosis] still under investigation but MD suspects viral infection, possibly from Tdap vaccine." *Id.* at 222. Fatigue and mild gait deviation were also observed. *Id.* at 215; *see also Id.* at 242–43, 258–59, 274–75 (documenting additional sessions).

On October 13, 2014, K.N. was assessed at the University of California – San Francisco pediatric multiple sclerosis ("MS") clinic by Dr. Jennifer Graves. Ex. 2 at 176–92. Following a thorough examination, K.N.'s treating physician concluded that her symptoms and response to steroids in July 2014 were consistent with acute demyelinating ON. *Id.* at 191. The "second clinical event occurred in the setting of 5-7 days of fever and has some features consistent and others less consistent with a prolonged (20 [minute]) seizure and sequelae… She may have had an infectious related encephalopathy." *Id.* K.N. was instructed to complete the steroid taper and to follow-up with the clinic; the recommendations also state to "[a]void live vaccines if possible, but vaccines in the setting of prior optic neuritis can be evaluated with a risk benefit approach." *Id.* at 192. The record from this assessment also contains the first reference to K.N. testing positive for MOG antibodies, although Dr. Graves only deemed their presence of "possible interest." *Id.* at 191.

From October 29-31, 2014, K.N. was hospitalized at the University of California – San Francisco following an episode of pain with eye movement and blurred vision. Ex. 2 at 203. K.N.'s treating neurologist and rheumatologist concurred that her MRI imaging was "most consistent with [a] vasculitic process, not MS." *Id.* at 205. Upon discharge, K.N.'s working diagnosis was "autoimmune [central nervous system] vasculitis." *Id.*; Ex. 4 at 943.

K.N. continued to follow-up with numerous doctors, and on November 21, 2014, she was evaluated by her rheumatologist for her "steroid-dependent [central nervous system] inflammatory condition associated with abnormal MRI findings." Ex. 2 at 228. Her vision had returned to normal, but she still reported left-sided weakness with physical activity; she was participating in physical therapy. *Id.* K.N. was tolerating her medications, and continued monitoring was recommended. *Id.* at 228, 232.

Throughout 2015, K.N. had multiple appointments with various treating physicians. *See, e.g.*, Ex. 4 at 1134–96, 1213, 1442. As of June 11, 2015, possible diagnoses included central nervous system ("CNS") vasculitis, MS with MOG antibodies of unclear significance, or neuromyelitis optica ("NMO"), although the latter was deemed unlikely. *Id.* at 1183. K.N. continued to follow-up with neurology, ophthalmology, gastroenterology, and rheumatology throughout 2016, 2017, and 2018. *See, e.g.*, Ex. 34 at 244. She stopped taking immunosuppressant medication in January 2018, and in August 2018 was noted to be in remission, with migraine headaches and fatigue as remaining issues. Ex. 34 at 247, 269. In February 2019, the headaches that she was having were considered to be unrelated to her "recurrent ON." Ex. 35 at 31.

On February 18, 2020, K.N. had a follow-up pediatric neurology visit. Ex. 36 at 5–13. The record noted that K.N. had remained MOG antibody-positive 1/100 over the past two years, and lab worked revealed that testing confirmed she remained positive that day, as well. *Id.* at 5–13, 18.

On March 15, 2022, at the age 18 years old, K.N. saw her neurologist, reporting that she had been experiencing severe depression since before the pandemic, for which she had missed the prior week of school, and that she had tried Lexapro, Zoloft (sertraline, an anti-depressant), and Wellbutrin (bupropion, an anti-depressant). Ex. 40 at 67–68. K.N. reported that she had not experienced visual symptoms or seizures in the previous two years, and did not report any tingling, numbness, weakness, imbalance, or sphincter issues. *Id.* at 68. She had not experienced migraines "in a while," but had mild headaches twice a week. And experienced some chronic fatigue. *Id.* The neurologist recommended that K.N. resume taking magnesium and riboflavin to prevent headaches and migraines, continue seeing a therapist and psychiatrist, and undergo another brain/orbit MRI. *Id.* at 74.

At a March 30, 2022 ophthalmology visit, K.N. underwent visual field testing, visual evaluation, and optical coherence tomography. Ex. 40 at 76–77. The results showed normal and stable distance and near card visual acuity, mild blue color deficits in the right eye, subtle worsening of blue color perception in the left eye, preserved acuity, and generally stable retinal nerve fiber layer and macular volumes with baseline low nerve fiber layer thickness since 2019. *Id.*

On May 31, 2022, K.N.'s mother filed an affidavit stating that K.N.'s mental health has been severely affected by her illness, and that she is being treated by a therapist and psychiatrist for depression, anxiety, and post-traumatic stress disorder, but no additional medical records were filed. Ex. 41 at 2–4.

## II.  Legal Standards for Vaccine Program Damages Components

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury," but only up to a capped sum of $250,000.00. Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

Determining the sum to be awarded for an injured party's pain and suffering can be more difficult than calculating other damages components, since there is no mathematic formula for assigning a monetary value to a person's pain and suffering/emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And of course I may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *See generally Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* opinion maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the

6

record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards—it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. *Graves* is not controlling of my determination herein, but it stands as a reasonable construction of the pain and suffering cap.

### III. Appropriate Compensation in this Matter

#### A. *Pain and Suffering*

In this case, awareness of the injury is not disputed. Even though Petitioner was a child when her injury occurred, the affidavits provided by her mother establish that K.N. was and continues to be aware of her condition. This leaves only the severity and duration of Petitioner's injury to be evaluated in calculating the pain and suffering component of damages. When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents.

Petitioner seeks $250,000.00 in pain and suffering. Br. at 77. K.N.'s medical records and her mother's affidavits provide descriptions of the pain and suffering she experienced during the height of her illness, and what she continues to experience present day. In her Motion, she cites to a damages decision involving MS—a chronic condition unlike the acute and monophasic condition she experiences, but which she deems comparable nevertheless due to the fear of relapse common to that claimant and herself. *Hitt v. Sec'y of Health & Hum. Servs.*, No. 15-1283V, 2021 WL 3598322, at *5–8 (Fed. Cl. Spec. Mstr. July 29, 2021) (awarding pain and suffering at the statutory cap amount of $250,000.00, based on the determination that the total amount was higher).

In addition, Petitioner references a number of cases involving acute/monophasic injuries like ON and ADEM that were resolved informally (and hence not via a reasoned decision) and which resulted in pain and suffering awards of between $125,000.00 and $175,000.00. Br. at 74–77; *Hulett v. Sec'y of Health & Hum. Servs.*, No. 17-392V, 2018 WL 2772548 (Fed. Cl. Spec. Mstr. May 14, 2018) (awarding $175,000); *Boyer v. Sec'y of Health & Hum. Servs.*, No. 15-1160V, 2017 WL 2537371 (Fed. Cl. Spec. Mstr. May 18, 2017) (awarding $160,000); *Smith v. Sec'y of Health & Hum. Servs.*, No. 10-486V, 2012 WL 1131932 (Fed. Cl. Spec. Mstr. Feb. 28, 2012) (awarding $125,000). She also cites to claims involving ADEM that were resolved informally between the same range. *See, e.g., Robinson v. Sec'y of Health & Hum. Servs.*, No. 19-2011V, 2021 WL 6067264 (Fed. Cl. Spec. Mstr. Nov. 15, 2021) (awarding $125,000 in pain and suffering); *Remmes Sec'y of Health & Hum. Servs.*, No. 19-736V, 2021 WL 5180239 (Fed. Cl. Spec. Mstr. Oct. 14, 2021) (awarding $176,625). Petitioner argues that she is entitled to a larger award, however, in light of the severity and length of her injury, and with consideration of her

unique circumstances (young age of onset, ongoing visual decline, and likelihood of future pain). *Id*. at 73–77.

In contrast, Respondent proposes the lesser sum of $125,000.00. Opp. at 1. He argues that even if Petitioner continues to experience mild visual deficits (that were not noticeable and have not caused a discernible impact on her vision), her *other* continuing symptoms are not sequelae of her injury. Opp. at 16–17. Otherwise, Petitioner's injuries were limited and have mostly resolved. *Id*. at 16. Petitioner's course included three hospitalizations (totaling 14 days) over the course of three months and ten PT sessions, at which time she responded well to treatment and improved rapidly. *Id*. at 16–17. And though Petitioner had several follow-up visits with providers in the subsequent years, she has had no disease recurrences and suffered no major side effects of her medication, and she remains stable and free of neurological symptoms after discontinuing medications. *Id*.

In defending a lower sum, Respondent maintains that *Hitt* is distinguishable because of the long-term, chronic character of MS, and its associated more-severe treatment course due to associated flares (as were evident in the case of the *Hitt* injured party). Opp. at 21–22; *Hitt*, 2021 WL 3598322, at *2–3, 6. K.N.'s injury was far more acute, and resolved within a year regardless of its subsequent sequelae and need for monitoring-oriented treatment. Opp. at 22. Respondent also distinguished a case involving the more acute condition of NMO. *Day v. Sec'y of Health & Hum. Servs.*, No. 12-630V, 2016 WL 3457749, at *6–7 (Fed. Cl. Spec. Mstr. May 31, 2016), *mot. for review den'd,* 129 Fed. Cl. 450 (2016) (awarding $250,000.00). Respondent deems NMO a "lifelong condition," and the injured child therein had suffered numerous relapses and required extensive treatment. Opp. at 23.

Respondent also observed that the stipulated or settled cases involving pain and suffering awards in ON and ADEM cases were of limited utility, since the reasoning behind their determinations could not be ascertained. Opp. at 23–24. By contrast, Respondent referenced a pain and suffering determination from a case involving Guillain-Barré syndrome ("GBS")—a peripheral neuropathy that is largely distinguishable even if it also involves autoimmune-caused nerve demyelination. *Id.* at 24–25, *citing Day v. Sec'y of Health & Hum. Servs.,* No. 20-588, 2021 WL 5143925, at *1 (Fed. Cl. Spec. Mstr. Oct. 5. 2021). *Day* actually involved an award exceeding what Respondent proposes ($175,000.00 rather than $125,000.00), but Respondent maintains that Petitioner's course herein was generally less severe. Opp. at 25.

After reviewing the record in this case and considering the parties' arguments, I find that the record best supports the conclusion that Petitioner suffered a *somewhat* moderate neurological demyelinating injury—as far as that kind of injury goes (an important qualification). There is a considerable lack of other comparable damages decisions from other ON and ADEM cases (and I have not been able to identify a case specific to MOGAD, which likely explains K.N.'s

injury). Ruling on Entitlement at 26. MOGAD appears to be mostly acute and monophasic in nature, and arguably is a better explanation for clustering instances of TM, ON, and/or ADEM that were observed in the past but understood to be distinct. *Id.* at 5–6, 12 (expert discussions of MOGAD). Thus, and despite its alarming and acutely-presenting character, it is qualitatively different from a longer-term demyelinating condition—whether CNS-oriented or impacting the peripheral nervous system. In addition, the considerations that always impact a pain and suffering award—length of hospitalization, degree and number of procedures for treatment, post-treatment recovery, etc.— remain relevant.

I do not find that Petitioner's preferred comparable in *Hitt* to provide compelling guidance herein, since it involves MS, a far more alarming and long-lasting form of CNS injury.[4] I also note that the series of settled cases referenced by Petitioner all involve a lower range of award (albeit in excess, for the most part, of what Respondent proposes). *See generally Robinson*, 2021 WL 6067264; *Remmes*, 2021 WL 5180239; *Hulett*, 2018 WL 2772548; *Boyer*, 2017 WL 2537371; *Smith v. Sec'y of Health & Hum. Servs.*, 2012 WL 1131932. While this "range" does not explicitly govern the outcome herein (even less so since none of these are reasoned decisions), the cases that create it collectively suggest that an award lower than what Petitioner seeks is more likely appropriate.

A comparable determination that I deem somewhat helpful herein comes from a case involving NMO suffered by a child. *Day v. Sec'y of Health & Hum. Servs.*, No. 12-630V, 2015 WL 8028393, at *1, 4–5 (Fed. Cl. Spec. Mstr. Nov. 13, 2015).[5] The injured child in *Day* presented to the emergency room on numerous occasions—even three years after her diagnosis she was hospitalized ten times in a single year. *Id.* at *4. Her symptoms included weight loss, fever, irregular pupils, leg weakness and numbness, and the child' mother repeatedly had to watch her daughter relearn to walk several times. *Id.* If she stopped taking oral steroids, the child's NMO symptoms would return. *Id.* Overall, her illness made it difficult for her to have a normal life, causing her to gain weight and rendering her unable to engage in her favorite sports and passions. *Id*. $250,000.00 in pain and suffering was ultimately awarded. *Day v. Sec'y of Health & Hum. Servs.*, No. 12-630V, 2016 WL 3457749, at *6–7 (Fed. Cl. Spec. Mstr. May 31, 2016), *mot. for review den'd on other grounds,* 129 Fed. Cl. 450 (2016).

K.N. was also a minor at the time of her vaccination—but her overall experience has not been nearly as severe, even though more than minor pain and suffering has been established. Br. at 55, 63–64. She endured hardship to obtain her diagnosis, presenting to the

---

[4] I also note that I have never determined that *any* vaccine can cause MS in the first place—further diminishing the value of the damages determination from a contrary case.

[5] As noted in the Ruling on Entitlement, NMO is a distinguishable condition, even if MOGAD and NMO are on the same overall spectrum of autoimmune inflammatory CNS demyelinating disorders. Ruling on Entitlement at 5, 6 n.3, 8

9

emergency room on three separate occasions (totaling 14 days) over the course of three months, prolonged treatment with side effects, and ten PT sessions. *Id.* at 52–53, 56–60. Petitioner's sequelae included chronic weakness, loss of facial muscle control, pain, and chronic fatigue. *Id.* at 1, 53–54. However, K.N.'s injury resolved, and she was able to stop taking her immunosuppressant medication in January of 2018 and was noted to be in remission by August of 2018. Ex. 34 at 247, 269.

By March 2022 she reported that she had not experienced visual symptoms or seizures in the past two years and did not report any additional sequalae from her injury. Ex. 40 at 67–68. In that same month, results from a visual field test visual evaluation, and optical coherence tomography showed normal and stable distance and near card visual acuity, mild blue color deficits in the right eye, subtle worsening of blue color perception in the left eye, preserved acuity, and generally stable retinal nerve fiber layer and macular volumes with baseline low nerve fiber layer thickness since 2019. Ex. 40 at 76–77.

Not all of Petitioner's post-injury symptoms can be shown to be related, however. Her remaining issues of migraine headaches and fatigue were considered unrelated to her injury. Ex. 35 at 31. Petitioner argues that her medical condition has impacted her mental health leading to depression, anxiety, and adjustment disorder. Br. at 61, 64–65, 68–70. Although I recognize the difficulty in processing these events as a child, a relationship between Petitioner's demyelinating illness and her later mental health problems have not been substantiated, and the records that have been filed do not establish that these mental health issues that arose in 2019 relate to her illness, (which arose over five years after vaccination).

This is not to say that Petitioner has fully recovered from her injury and has no ongoing sequelae. The record indicates a visual deficit that needs to be monitored, as addressed in Petitioner's request for future unreimbursed expenses. This impact of Petitioner's vision is documented but has not caused a discernible impact on her functional vision.

For these reasons, I find that Respondent's proposal of $125,000.00 is far too modest, even though I accept his argument that not all of Petitioner's post-vaccination sequelae were related. Respondent's proposed figure fails to properly recognize K.N.'s experience with her initial symptoms, diagnosis, hospitalization and treatment course for her injury, and the significant impact on her life. Rather, the "best" pain and suffering sum to be awarded is substantially higher, and more in keeping (if not in excess of) the range of determinations from the stipulated results discussed above.

At the same time, however, Petitioner's preferred sum is excessive under the circumstances. K.N.'s residual symptoms that *are* attributable to her injury appear to be mild. I also deem her "actual" pain and suffering to be less significant than in *Day*—and that her

future prognosis is not severe enough to so exceed the cap. Accordingly, balancing the severity of the injury and Petitioner's personal loss against the relatively moderate severity of disease course and little follow-up treatment requirements, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$190,000.00** in total compensation for actual/past pain and suffering is reasonable and appropriate in this case. This figure is above the range of results discussed, as well as Respondent's preferred comparable from the later *Day* GBS case,[6] but is more appropriate for a largely one-time injury that will not likely recur or negatively progress.

### B.     *Past Unreimbursed Expenses*

The parties agree on the amount of $1,949.19 for past unreimbursed expenses. Br. at 49–50; Opp. at 26 n.4. That sum is therefore adopted in this damages decision.

### C.     *Future Unreimbursed Expenses*

Petitioner also requests future costs in the amount of $30.00 per year (through age 26) for the costs of annual neurology and ophthalmology visits, increasing to $50.00 per year thereafter (from age 27 through 65 years old) for the costs of annual ophthalmology visits—$2,190.00 total. Br. at 50–51; Reply at 6–8. Respondent maintains that Petitioner's request was not previously raised and is not supported by the evidence. Opp. at 26 n.4. I find that this damages component has preponderantly been connected to Petitioner's vaccine injury.

First, Petitioner has persuasively pointed to specific instances where future medical costs were outlined within her settlement demand and communicated with Respondent's former counsel and forwarded to current counsel. Reply at 6. Second, the record reveals that Petitioner's treaters have routinely recommended regular follow-up visits with neurology and ophthalmology and follow-up testing for her continuing visual deficits. Ex. 36 at 3–13; Ex. 40 at 67–74; Br. at 50–51; Reply at 6–8. Petitioner also explained her expenses in detail by filing the average co-payment for specialty visits from a leading healthcare provider, and thus has reasonably substantiated this aspect of damages. Br. at 51, 85–91. Respondent did not sufficiently address this matter (but for in a footnote) and did not file anything further to express his issues with the amount requested. Accordingly, I find that Petitioner has established that these costs are reasonably associated with her treatment; therefore, I find that Petitioner is entitled to compensation for future unreimbursed medical expenses.

---

[6] This *Day* case is not the same as the 2015-16 *Day* case involving NMO that I have referenced.

11

## CONCLUSION

For all the reasons discussed above and based on consideration of the record as a whole, **I hereby award a lump sum of $194,139.19, in the form of a check payable to Petitioner, reflecting the following:**

- **$190,000.00, representing an award of actual pain and suffering;**

- **$2,190.00, representing future unreimbursed expenses;  and**

- **$1,949.19, representing past unreimbursed expenses.**

These amounts represent compensation for all damages that would be available under Section 15(a).

Absent a timely motion for review, the Clerk of Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.